UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     .    Case No. 1:03-CR-00039
                              .    (CKK)
          Plaintiff,          .
                              .    Washington, D.C.
     v.                       .    November 5, 2008
                              .
NICHOLAS STENGEL,             .
                              .
          Defendant.          .
. . . . . . . . . . . . . .   .

HEARING ON MODIFICATION OF CONDITIONS
OF SUPERVISED RELEASE
BEFORE THE HONORABLE ALAN KAY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     Office of the U.S. Attorney
                       By:  ANGELA GEORGE, ESQ.
                       555 Fourth Street, NW
                       Washington, DC 20530

For the Defendant:     Law Offices
                       By:  ALLEN DALE, ESQ.
                       601 Pennsylvania Avenue, NW
                       Suite 900, North Building
                       Washington, DC 20004

For Probation:         MR. FREDERICK ALBERT

Proceedings recorded by electronic sound recording.
Transcript produced by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1          (Proceedings commenced at 10:40 a.m.)

2               THE CLERK:  Criminal Case Number 2003-39, The

3     United States of America v. Nicholas Stengel.

4               Is that right?  Is that how you pronounce it,

5     Stengel?

6               THE DEFENDANT:  Yes.

7               THE CLERK:  Angela George representing the

8     government.

9               Allen Dale representing the defendant.

10              The probation officer is Frederick Albert.

11              The defendant is present in the courtroom.

12              MR. DALE:  Good morning, Your Honor.

13              THE COURT:  Good morning.

14              THE CLERK:  This is set down for a hearing on

15     violation of supervised release.

16              THE COURT:  Mr. Albert, if you can come

17     forward and state on the record, what brings Mr.

18     Stengel before the Court this morning.

19              THE PROBATION OFFICER:  Good morning, Your

20     Honor.

21              We appear before Your Honor today in

22     reference to a memorandum sent to Judge Kollar-Kotelly,

23     dated October 7th, 2008.

24              The purpose of this memorandum was to give --

25     provide a status report in regards to Mr. Stengel, on

1   supervision and treatment, and also to request a

2   modification of conditions, to include GPS monitoring.

3           If Your Honor wishes, I can provide a brief

4   summary of the memorandum.

5           THE COURT:  All right.

6           I don't -- There -- Is there a copy in the

7   jacket, do you know?  Would there be a copy in the

8   jacket?

9           THE CLERK:  Lots of times they don't put them

10  in anymore, Judge, so no, there is not.

11          THE COURT:  I'll return this to you in a

12  moment, Mr. Albert.

13          THE PROBATION OFFICER:  That can be for Your

14  Honor's file.

15      (Pause.)

16          THE COURT:  All right.  Go ahead.

17          THE PROBATION OFFICER:  In brief, Your Honor,

18  approximately September 24th of 2008, of this year, Dr.

19  Siegel, with Clinical and Forensic Associates,

20  contacted this officer to discuss issues regarding Mr.

21  Stengel's treatment involving his acceptance or

22  participation in the polygraph examination --

23          THE COURT:  Clinical Forensic Associations

24  are a -- provide a program, what, recommended by the

25  probation office, or is that independent or --

1          THE PROBATION OFFICER:  -- this --

2          THE COURT:  -- counseling --

3          THE PROBATION OFFICER:  Clinical Forensic

4    Associates provides sex offender treatment, per the

5    special condition ordered for Mr. --

6          THE COURT:  I see.

7          THE PROBATION OFFICER:  -- ordered for Mr.

8    Stengel.

9          THE COURT:  All right.

10          So -- And they're approved by your office?

11          THE PROBATION OFFICER:  They were approved

12    by --

13          THE COURT:  They're a contracting party with

14    the probation office?

15          THE PROBATION OFFICER:  Yes, Your Honor.

16          THE COURT:  All right.

17          THE PROBATION OFFICER:  In brief, Your Honor,

18    Mr. Stengel believed that based on has heightened

19    levels of anxiety, which he does suffer from, and does

20    receive outside treatment through a psychiatrist, that

21    the polygraph examination would not provide an accurate

22    reading in regards to his truthfulness, in regards to

23    any questions asked of him.

24          Dr. Siegel worked with him in -- into regards

25    to the validity of the polygraph, and the ability for

1   the polygraph to make an accurate determination,

2   despite what levels of anxiety.

3          Later, on October -- This reference back --

4   in my memorandum, that Mr. Stengel's issue and concerns

5   may have dealt back to an October 25th, 2007 polygraph,

6   in which he did show a pattern of deception in regards

7   to the polygraph, this officer met with Dr. Siegel, and

8   Mr. Stengel and his wife, in a conference at our

9   office.  We did discuss the issues involving the

10  polygraph examination.

11          This officer also supported that despite what

12  levels of anxiety, that we would still be able to get

13  an accurate read, as far as into his truthfulness, in

14  regards to any questions asked of him.

15          We also wanted to provide Mr. Stengel the

16  understanding that the polygraph examination is a tool

17  of treatment, and not a tool of the probation office,

18  and it would be utilized in order to identify issues

19  and needs of the treatment provider, in order to

20  address his specific treatment plan.

21          THE COURT:  As opposed to ascertaining the

22  credibility of Mr. Stengel?  It's just -- It might be

23  analogous to, let's say, a -- an MRI or a -- an x-ray

24  exam, which leads a medical provider to ascertain what

25  sort of treatment should follow from that.

1          Is that a --

2          THE PROBATION OFFICER:  I believe that's --

3          THE COURT:  -- a fair analogy?

4          THE PROBATION OFFICER:  I believe that's a

5    fair analogy.  It is utilized as a treatment tool, yes,

6    Your Honor.

7          Probation is not asking for any --

8          THE COURT:  So not passing the polygraph has

9    no adverse implications to Mr. Stengel, something that

10   would be taken by the probation office or, for that

11   matter, cognizance taken by the Court, it's for the

12   purpose of Dr. Siegel --

13         THE PROBATION OFFICER:  Dr. Siegel, sir.

14         THE COURT:  -- assigning some sort of

15   treatment program or counseling, or a direction of the

16   counseling?

17         THE PROBATION OFFICER:  Yes, or identifying

18   further issues that need to be addressed by treatment.

19         THE COURT:  Okay.

20         THE PROBATION OFFICER:  Further, the

21   memorandum addressed -- Judge Kollar-Kotelly also

22   referenced the request for modification of conditions

23   for a GPS monitoring.

24         In brief, the memorandum would suggest that in

25   October 25th of 2007, excuse me, Your Honor, August

1    2nd, 2007, a memorandum was forwarded in which alleged

2    violations of supervised release were brought to the

3    attention of the Court, which Mr. Stengel, based on

4    heightened levels of anxiety, went out, sought child

5    pornography, and was caught masturbating in public.

6            The GPS monitoring, we asked to be utilized as

7    a public safety tool in order to be able to -- during

8    this period of heightened anxiety, to be able to

9    monitor his movement and, if need be, to also put in

10   inclusion zones or exclusion zones on his movement, so

11   we would be able to better understand where he may or

12   may not be going.

13           And that would be, in brief, the memorandum

14   for October 7th, 2008.

15           THE COURT:  All right.  Thank you.

16           Mr. Dale?

17           MR. DALE:  First of all, I apologize for

18   filing of the pleadings so late, and then getting it to

19   your chambers.  For some reason, actually, Mr. Stengel,

20   until he heard from me, was not even notified of this

21   hearing today, and the -- it was mailed to a building

22   that I used to own, which was sold and was torn down

23   five years ago.

24           THE COURT:  What was mailed?  What --

25           MR. DALE:  The notice of the hearing, --

1              THE COURT:  Oh, I see.  The notice.

2              MR. DALE:  -- and the report that Mr. Albert

3    is talking about.

4              I found out about it because it came across

5    through ECF and made its way to me, and then I was able

6    to reach Mr. Albert, but we tried to get all this put

7    together in time for this hearing today, and I

8    literally was working on it until the last minute.

9              At any rate, in our pleading we lay out our

10   position, and I can briefly summarize that.

11             First, let there be no doubt, Mr. Stengel is

12   prepared to do whatever is asked of him.  There is just

13   no doubt about that.

14             THE COURT:  Well, they're two things being

15   requested of him now, --

16             MR. DALE:  Yes.

17             THE COURT:  -- at this point, by the

18   probation office.

19             One is as an aspect of his treatment, and for

20   the purposes of determining the scope or type of

21   treatment, if you will, that the treating physician or

22   -- Is Dr. Siegel a psychologist or psychiatrist, I

23   don't know, but I don't --

24             MR. DALE:  Well, can I address that?  I think

25   before the Court --

1          THE COURT:  Well, no.  What I'm saying is

2     that I'd like you to focus in.  If there is a problem

3     with the two modifications, if you will, either

4     recommended or requested by the probation office, for

5     instance, let's go with the monitoring, GPS monitoring,

6     all right, is that something that defendant would agree

7     to or not agree to?

8          MR. DALE:  I'm really not trying to avoid the

9     answer, and I know that should be a "Yes" or "No."

10    It's not that easy, but I'll -- he will agree to it,

11    but if I can just say, we don't see the purpose for it

12    because the premise of the GPS was that -- two things.

13          He failed a polygraph over a year ago --

14          THE COURT:  You're suggesting that that was a

15    precipitating factor?

16          MR. DALE:  That's what the -- That -- In the

17    October memorandum to the Court, there are two things

18    that are listed several times in the report, as the

19    reasons for asking for GPS monitoring; that he failed a

20    polygraph over a year ago, in 2007, and that he refused

21    to take a polygraph last month, and since neither of

22    those is really true, there's no predicate for the

23    request for the GPS.

24          THE COURT:  Well, --

25          MR. DALE:  And, I mean, I have to say that.

1    I mean, that -- that's --

2            THE COURT:  No, I understand where you -- I

3    understand the point you're making, Mr. Dale, but there

4    is some assertion by the probation office, that Mr.

5    Stengel engaged in inappropriate conduct at a

6    particular location, and I think what I heard him say,

7    that in the concern for public safety, that the GPS

8    would in -- to some degree, permit them to utilize

9    where -- the locations that Mr. Stengel frequents, and

10   to determine whether or not there would be some basis

11   for restricting his going to a particular type of

12   location.

13           That's what I'm hearing, and I don't know if

14   -- I'm not disputing the fact that in the memorandum is

15   the suggestion that the results of the polygraph was

16   also a contributing factor to that request, but that

17   what I heard Mr. Albert state on the record this

18   morning, was the desire to know where Mr. Stengel

19   frequents, and whether or not that would require, as

20   part of his supervision, that he stay away from certain

21   types of locations, that this was a public safety

22   issue.

23           MR. DALE:  I heard that here for the first

24   time, Your Honor.

25           My memorandum and all my preparation for today

1    was based upon the words of the memorandum that was

2    sent.

3                THE COURT:  Well, I have no problem with --

4                MR. DALE:  Okay.

5                THE COURT:  -- you chatting with Mr. Albert

6    and getting further enlightenment on that before you

7    make a determination as to whether or not Mr. Stengel

8    would agree to that.

9                I understand the distinction you're making,

10   that Mr. Stengel is willing to comply with whatever

11   conditions the Court imposes, but based upon what you

12   -- your earlier understanding, there was really no

13   explanation of why that particular condition should be

14   imposed.

15               MR. DALE:  Precisely, Your Honor.  I mean, --

16               THE COURT:  But now you know that there is --

17               MR. DALE:  Okay.

18               THE COURT:  -- another reason.

19               MR. DALE:  I -- Yes, and I'm just wondering,

20   and if I could -- as I understood the question from the

21   Court to Mr. Albert, that the use of the polygraph is

22   not -- would not be used by the probation office or the

23   Court to attempt to revoke or do anything, it's only

24   being used by the treating psychologist.

25               Was that my understanding?

1          THE COURT:  That was a question I asked Mr.

2    Albert, and I think Mr. Albert said that that was a

3    fair analogy.  I don't know if he was --

4          THE PROBATION OFFICER:  Your Honor, I --

5          THE COURT:  -- willing to go beyond that.

6          THE PROBATION OFFICER:  If I may, I would

7    like to answer Mr. Dale's question in regards to the

8    first part.

9          I think Mr. Dale, to make -- I did briefly

10   summarize what I just stated, but based on my letter,

11   based on Mr. Stengel's prior inappropriate sexual

12   behavior induced by stress, his failure of prior

13   polygraph examinations, and his current unwillingness

14   to participate in polygraph testing, this officer views

15   Mr. Stengel as an elevated public safety risk.  That is

16   what we're really trying to surmise in this letter.

17         It is a brief noting to the Court that based

18   on Mr. -- The polygraph examination failure last year

19   has nothing to do with the GPS monitoring of this year,

20   except only to the fact of showing a continuing pattern

21   on Mr. Stengel's part, when he was working on an

22   elevated level of stress.  So we were concerned that

23   showing similar patterns from last year, when he had

24   concerns about the polygraph examination, and similar

25   patterns of heightened anxiety, it was the probation

1    office's concern that Mr. Stengel may become a

2    heightened level of risk to the public, and that's --

3    that was what we were stating with --

4              THE COURT:  Does the polygraph, --

5              THE PROBATION OFFICER:  -- regards to the

6    GPS.

7              THE COURT:  -- the results of the polygraph

8    give a medical professional, such as a psychiatrist or

9    psychologist, an indication of the level of stress an

10   individual is under.

11             MR. DALE:  The polygraph examination --

12             THE COURT:  What I'm hearing from Mr. Dale,

13   is he doesn't see the connect.  He sees two sort of

14   ends of a bridge, and he doesn't see the bridge in

15   between, as to why the polygraph would lead to a

16   feeling of security on the part of the probation

17   office, --

18             THE PROBATION OFFICER:  Okay.

19             THE COURT:  -- and its responsibilities --

20             THE PROBATION OFFICER:  We have two separate

21   issues, actually.

22             THE COURT:  -- to carry out the supervision,

23   that knowing where he is physically located at any

24   particular time, how does that connect up with the

25   polygraph?

1          THE PROBATION OFFICER:  I'm not certain they

2    do connect, Your Honor.  This is one letter with two

3    intents -- intentions, if -- It's -- One is a status

4    report and one is a modification request.

5          The first portion of the status report is to

6    let the Court know where Mr. Stengel -- what progress

7    he's made since the last polygraph examination, which

8    brought concern to the probation office in regards to

9    the memorandum, dated August --

10         THE COURT:  All right, but --

11         THE PROBATION OFFICER:  -- 2nd, so --

12         THE COURT:  I understand the two requests.

13         THE PROBATION OFFICER:  -- there are two --

14   There are two different -- The current situation, as

15   far as the polygraph examination, it brings to --

16   concern of where he was last year, that he may go out

17   and act in a further risk to the public, so the GPS is

18   actually -- there is a connect in the fact that his

19   failure of last year's polygraph examination, his last

20   year levels of heightened anxiety, by his own

21   admission, caused him to go out and act.

22         We see similar patterns that revolve around

23   the anxiety and the polygraph, so there are two

24   separate issues, I think, involved in this memorandum,

25   and maybe not clearly stated.

1          THE COURT:  But one of the concerns

2    expressed, Mr. Dale, is that the polygraph test results

3    -- Polygraph, generally speaking, when they're utilized

4    to ascertain whether someone is telling the truth or

5    not, have a negative connotation to it, if someone

6    "fails."

7          The question is, by taking someone's blood

8    pressure, you take someone's blood pressure and you

9    don't talk about blood pressure -- failing a blood

10   pressure test, or failing a cholesterol test, you talk

11   about whether or not it's high, or whether it's low,

12   and whether or not there's any significance to that,

13   and how you go about treating someone.

14         So what Mr. Dale posed as a question is, what

15   does -- "Is the probation office saying that not

16   passing a polygraph test doesn't have any adverse

17   implications, if you will, or negative implications, or

18   criminal implications, or would result in an allegation

19   that he was not complying with the conditions of his

20   release?", and I think your explanation of that is,

21   "No, it would not.

22         THE PROBATION OFFICER:  Well, it --

23         THE COURT:  It would merely dictate to the

24   treating physician or psychologist, that a -- perhaps a

25   modification of therapy that he's receiving.

1              THE PROBATION OFFICER:  Your Honor, to answer

2    that in full, I mean, there's no real clear answer, but

3    the probation office position at this point, is that

4    the polygraph is a tool of testing for the treatment

5    provider.

6              Of course, if a --

7              THE COURT:  That's what I thought I was

8    saying.

9              THE PROBATION OFFICER:  Right.

10             I wanted to clarify also, I couldn't, with

11   clear conscience, say that if a polygraph examination

12   came back with any true heinous act or violation of any

13   known victim, that further action would not be

14   requested on the part -- by treatment.

15             Probation's role in -- as regards to a -- as a

16   voice or spokesperson back to the Court in regards to

17   conditions, we would obviously note to Your Honor that

18   there was some very disturbing information returned

19   from the polygraph examination but, of course, the

20   treatment provided would have to work in conjunction

21   with the U.S. attorney.

22             So, that has happened in the past.  I assume

23   that regards of the concern for the Court, our

24   intention at this point, as far as polygraph testing,

25   is to have Mr. Stengel participate in order to provide

1    the treatment provider a clear guide as to where to

2    provide treatment, and what areas that Mr. Stengel

3    needs further assistance in his -- as far as his

4    treatment.

5            I think that can be seen in the -- As -- What

6    the probation office's role is, is based upon the

7    special condition that he participate in mental health

8    treatment, to include polygraph testing, plethysmograph

9    examinations, and able assessments.

10           We are utilizing these as a tool, it states

11   as -- as it states in the special conditions.  We're

12   not utilizing these in any sense to further a --

13           THE COURT:  Now, are these --

14           THE PROBATION OFFICER:  -- violation against

15   --

16           THE COURT:  -- are these special conditions

17   approved by the trial court?

18           THE PROBATION OFFICER:  Yes, these are in

19   place by --

20           THE COURT:  So Judge Kollar-Kotelly has

21   previously approved the requirement that as part of

22   his --

23           THE PROBATION OFFICER:  Yes.

24           THE COURT:  -- treatment program, that he

25   participate in periodic --

1          THE PROBATION OFFICER:  Yes.

2          THE COURT:  -- polygraph; is that correct?

3          THE PROBATION OFFICER:  Yes, Your Honor.

4          MR. DALE:  That's correct, Your Honor.

5          THE COURT:  Well, --

6          MR. DALE:  And he's never refused to take a

7     polygraph.

8          In fact, --

9          THE COURT:  Yes.

10          MR. DALE:  -- we submitted him to one last

11    week, with the current questions.

12          THE COURT:  So -- And he's agreed to go ahead

13    and do that, so I don't understand what's -- what I

14    need to do with respect to the polygraph.

15          THE PROBATION OFFICER:  In respect to the

16    polygraph, we're not asking Your Honor to go forward

17    with anything further, other than supporting --

18          THE COURT:  Okay.

19          THE PROBATION OFFICER:  -- that Mr. Stengel

20    participate with the polygraph examinations, as

21    scheduled, --

22          THE COURT:  But that's a requirement that was

23    imposed by Judge Kollar-Kotelly.

24          THE PROBATION OFFICER:  We were looking for

25    reinforcement.  We thought --

1             THE COURT:  I see.

2             THE PROBATION OFFICER:  -- that Judge Kollar-

3    Kotelly would be --

4             THE COURT:  Okay.

5             THE PROBATION OFFICER:  -- having this

6    hearing.

7             THE COURT:  Well, Mr. Dale, --

8             THE PROBATION OFFICER:  In regards to the

9    second part --

10            MR. DALE:  That's exactly why, Your Honor,

11   I'm trying to find that bridge that Your Honor had

12   talked about, because in the polygraph, there's not an

13   issue.

14            THE COURT:  All right.

15            MR. DALE:  And, in fact, that's why --

16            THE COURT:  So the next time that a polygraph

17   is requested by the treating medical people, you're

18   saying that your client will show up dutifully, and

19   take that test?

20            MR. DALE:  In fact, I talked to my client

21   this morning.  He's willing to invest my hourly rate

22   into making -- putting me in as a mediary, so that I

23   can make sure it happens.

24            THE COURT:  All right.

25            MR. DALE:  They call me, I will bring him

1   there personally.  It will happen, and there'll be no

2   issue about it.

3          THE COURT:  Well, maybe you can adjust your

4   rate, Mr. Dale.

5      (Laughter.)

6          THE PROBATION OFFICER:  I don't believe Mr.

7   Dale will need to be present as a mediary.

8          THE COURT:  No.  No.  No.  Doesn't say -- No.

9   No.  No.  I think they were using him as an escort.

10          THE PROBATION OFFICER:  And in conclusion,

11   with the GPS, to help Mr. Dale, we didn't have time to

12   speak for -- beforehand --

13          THE COURT:  Okay.  All right.

14          So then there's no issue with the polygraph

15   at this juncture.  It's required by Judge Kollar-

16   Kotelly.  Mr. Dale, on behalf of his client, I assume

17   his client authorized him to make those statements, --

18          MR. DALE:  He did.

19          THE COURT:  -- that whenever Dr. Siegel feels

20   there is a need for a polygraph test, that Mr. Stengel

21   will make himself available at a mutually convenient

22   time.

23          MR. DALE:  Just so the record is clear, it's

24   not the doctors who have requested it, it's the

25   probation office requesting it, and telling the doctors

1   who they're paying to --

2           THE PROBATION OFFICER:  That's not correct,

3   Your Honor.

4           MR. DALE:  That's what they told me, but --

5           THE COURT:  Well, I think the two of you

6   better --

7           MR. DALE:  We can work that out.

8           THE PROBATION OFFICER:  We can work that out.

9   Treatment contacts us and --

10          THE COURT:  I would assume a medical

11  person --

12          THE PROBATION OFFICER:  -- begs us for money,

13  really is what it comes down to, is when they want to

14  do it and we don't -- we just based it on that.

15          THE COURT:  I don't think a non-medical, and

16  Mr. Albert is not holding himself out as a psychologist

17  or psychiatrist, is going to dictate to any medical

18  professional, as to what tests to run, short of drug

19  tests.

20          THE PROBATION OFFICER:  And if I could for --

21  and I'll let Mr. Dale finish.  I wanted to answer his

22  question before the Court.

23          The disconnect I think he has with the GPS, is

24  we've made this determination at this point, to request

25  looking at and going forward with the GPS, that we were

1    identifying similar patterns of inappropriate -- not

2    inappropriate, of certain psychological anxieties and

3    stresses that Mr. Stengel exhibited last year, so that

4    brings the concern to us that this year he may go

5    through the same patterns of inappropriate sexual

6    behavior in the community, so we've asked for a GPS

7    monitoring aspect to his supervision, so we will be

8    able to use that as a tool, should he be continuing to

9    go through levels of anxiety, where he showed that he

10   had acted out in previous instances.

11          I -- Does that answer the question?  I

12   mean, --

13          MR. DALE:  I understand now, what Mr. Albert

14   is saying, and if I could just counter that, to the

15   extent it can be countered.

16          The anxiety level is down.  We've submitted a

17   report from his -- from Dr. Gene Shooter, who has been

18   his treating psychologist for some time, showing that

19   he is on course there, that he attends whatever

20   meetings are scheduled, and that things are working

21   out.  There's been no acting out.

22          Also, I've spoken with Dr. Weiner, who is the

23   head of the group where Mr. Stengel is being sent by

24   the probation office.  Obviously, we have the letter

25   that's a part of the -- of our -- one of our exhibits,

1    from Dr. Siegel.

2              There doesn't seem to be a problem.  We took

3    him for a polygraph.  He passed the polygraph, worked

4    with someone who, as we point out, is -- kind of leans

5    to the side of the police, the prosecution, passed

6    every question then.

7              THE COURT:  Well, again, I -- you're using

8    language --

9              MR. DALE:  Right.

10             THE COURT:  -- which is not reflective, I

11   think, of what the polygraph test is designed for in

12   this instance, in this instance.

13             MR. DALE:  But now I'm talking about GPS, and

14   there just really isn't a heightened --

15             THE COURT:  No.  No.  No.

16             MR. DALE:  -- level of anxiety.

17             THE COURT:  All I'm saying is when you use it

18   on the record, that, "Well, he passed the test," --

19             MR. DALE:  I'm sorry.  He --

20             THE COURT: -- the passing or failing of the

21   test is not the criterion, the criterion is whether or

22   not that passing or failing, so to speak, would

23   necessitate or suggest a different form of treatment,

24   or modification of the treatment.

25             MR. DALE:  Right, and we'll share that with

1    the psychologist, and let them determine what they want

2    to do.

3              THE COURT:  All right.

4              Go back to the GPS.

5              MR. DALE:  But the GPS, it's a matter of, as

6    his attorney, I do not see the reason for a GPS, based

7    upon this record.  I just don't see it, and if -- and I

8    just don't believe that a probation office, and this is

9    nothing against Mr. Albert, I do not question his

10   motives in this, whatsoever, I'm sure they're pure, he

11   has a job to do, but I don't see that the probation

12   office can just pick, and I hate to use the word

13   "willy-nilly" but I'll pick it, just something to put

14   on him.

15             For example, no alcohol.  I mean, that just

16   kind of comes out of left field.  There's never been an

17   issue with alcohol, never been an issue with drugs.  In

18   fact, the Court waived drug testing.  It's just never

19   been an issue, but all the sudden now, it's something

20   else to put on him.

21             I don't see the need for GPS on this record,

22   and especially given what the GPS is supposed to

23   address.

24             As we point out in our pleading, GPS is gonna

25   show where he is.  There's never been a hint that he's

1    ever acted out, as far as harming anyone, touching

2    anyone, doing anything to anyone.  It's him and his

3    pictures is what's happened in the past, and he's

4    seeking treatment for that.

5             The GPS is gonna say, "Well, he's at home

6    now."  Well, he could be at home now with his pictures.

7    He's not going to be.  I don't believe he's going to

8    be, but just -- a GPS just seems to be something else

9    that's just going to raise his level of anxiety, and I

10   don't see the need for it right now.

11            And having said that, he'll do whatever the

12   Court orders.

13            THE COURT:  All right.

14            Thank you, Mr. Dale.

15            Would you like to respond, Mr. Albert, or

16   not?

17            THE PROBATION OFFICER:  Your Honor, this --

18            THE COURT:  Perhaps, specifically --

19            THE PROBATION OFFICER:  Your Honor, as Mr.

20   Dale says, we're not working off of willy-nilly.  We're

21   basing it on prior studies, prior national studies

22   based upon actions of known sexual offenders with prior

23   histories, much similar to Mr. Stengel's and, you know,

24   as far as the no alcohol, if you want to -- if you wish

25   to address that further, we would suggest that, you

1  know, based upon prior studies and information of

2  people dealing with anxiety and depression that (a)

3  alcohol is a horrible thing to be used as a -- in

4  conjunction --

5          THE COURT:  Is there any --

6          THE PROBATION OFFICER:  -- so --

7          THE COURT:  Is there any indication that Mr.

8  Stengel uses alcohol or --

9          THE PROBATION OFFICER:  Well, throughout the

10  case notes --

11          THE COURT:  -- in any -- to any degree,

12  whether it's social, or being --

13          THE PROBATION OFFICER:  -- we would note that

14  every case note -- I only took this case on very

15  shortly, maybe two, three months ago, that throughout

16  the case notes, through Officer Panzer, through Officer

17  Carter and through myself, that in each case note was

18  noted the amount of -- large amount of alcohol bottles

19  strewn across the apartments on a regular basis: Beer

20  bottles, wine bottles, just across -- throughout the

21  apartment.

22          It was noted -- The "no alcohol" was not

23  necessarily from myself, it was based upon prior notes

24  and information from other officers having previously

25  supervised it.

1          THE COURT:  There's an indication that the

2    alcohol in those -- assuming there were -- there was

3    alcohol in those bottles, that that was being imbibed

4    by Mr. Stengel?

5          THE PROBATION OFFICER:  We can't make that,

6    but what I would suggest to Your Honor is -- further,

7    is that in all case studies involving sexual deviant

8    cycles and treatment, most districts have, as a

9    standard, no alcohol.  The majority of deviant sexual

10   acts happen while under the influence of alcohol.  Most

11   treatment providers have asked for it.  We are working

12   towards going to that--

13         THE COURT:  How do you enforce that?

14         THE PROBATION OFFICER:  We would do it

15   through random breathalysers, randomly stopping --

16         THE COURT:  Random.

17         THE PROBATION OFFICER:  -- just stopping by

18   the home.  That -- I just don't want anybody to ever

19   feel or walk away today feeling that probation is

20   taking a random selection, and just making up new

21   special conditions.  We are trying to base these upon

22   information, studies and trainings that we've invested

23   in throughout the nation, over the last year and, as I

24   said, you know, it is our -- as Mr. Dale said, it is

25   our intention only to provide Mr. Stengel the highest

1    level of supervision, and also the community, the level

2    of security that we feel they need.

3             THE COURT:  Let me ask you, Mr. Albert, would

4    it be useful or efficacious for you to request that the

5    Court impose an additional condition of random

6    breathalyzing tests, and if, on the basis of those

7    tests, it appears that he's testing positive for use of

8    alcohol, that you can then put a prescription -- or

9    request a prescription on use of alcohol?

10            I mean, at this juncture, you're not sure who

11   is the one who is emptying those bottles, or whether or

12   not --

13            THE PROBATION OFFICER:  No.

14            THE COURT:  -- they're collecting empty

15   bottles, I don't know, but --

16            THE PROBATION OFFICER:  But we would -- we

17   still would base the alcohol -- If Mr. Stengel, by his

18   -- by all known prior case history, is under

19   psychological care for anxiety and depression, and he's

20   on heavy levels of medication for these, that he is, by

21   his own admission, not being able to stabilize at the

22   time, we would, by all accounts, whether he was a

23   mental-health or the bipolar disorder --

24            THE COURT:  You would require or recommend

25   that he not use alcohol --

1          THE PROBATION OFFICER:  Right.

2          THE COURT:  -- while he's on those

3    medications.

4          THE PROBATION OFFICER:  So, I know Mr.

5    Stengel may not agree with that, we would -- and as I

6    said to you, I am only a probation officer, I am not a

7    doctor or psychiatrist.  We only base these on study.

8          THE COURT:  But the -- how do the doctors

9    feel about his using alcohol?

10          THE PROBATION OFFICER:  We would -- I would

11    suggest that as far as the sexual offender portion of

12    it, is the doctor I speak to the most.  We've spoken

13    about that as a condition.  I -- They have never --

14    I've never gone further, with getting a full -- whether

15    they support it in this instant or not.

16          I was only basing it on the national standard

17    that we are trying to impose for our own district, and

18    also in conjunction with his known anxiety and

19    depression disorders.

20          THE COURT:  How you respond to, and again, I

21    don't want to put you in a position where I'm looking

22    for medical guidance on that, but Mr. Dale suggests

23    that monitoring Mr. Stengel would exacerbate whatever

24    stress he's under, the mere fact of monitoring him

25    might have the effect of increasing his stress.

1          THE PROBATION OFFICER:  I would suggest to

2     you, if Mr. Stengel is not behaving in an adverse

3     manner, there would be no level of anxiety increase.

4          We're only talking about a small mechanized

5     devise that goes on an ankle.  It's hardly even

6     noticeable to most people.

7          So if he is behaving in a normal, socially

8     acceptable fashion, I don't see where it would cause

9     any level of increased anxiety, --

10         THE COURT:  So, it's your --

11         THE PROBATION OFFICER:  -- but I'm not a

12    doctor, so I don't know that.

13         THE COURT:  -- it's your view that if you

14    knew his location, that would give you an indication as

15    to whether or not he was engaging in appropriate or

16    inappropriate conduct?

17         THE PROBATION OFFICER:  That's -- No.  We

18    would more so state that we would be able to monitor

19    where he is going on a regular basis, and making

20    determinations if there are any patterns of concern --

21         THE COURT:  In other words, does he frequent

22    a particular location which would have no apparent need

23    for him to frequent that location?

24         THE PROBATION OFFICER:  Correct, and it would

25    also --

1          THE COURT:  Go to school or a --

2          THE PROBATION OFFICER:  -- work in

3    conjunction --

4          THE COURT:  -- college building.

5          THE PROBATION OFFICER:  We frequently work in

6    conjunction with many agencies.  If we were to know,

7    based on his patterns of -- and how he acts out

8    inappropriately, if there were anything in those areas,

9    we would also be able to correlate those as possibly

10   being a issue or pattern with our own supervised

11   release (unintelligible), that may be something we

12   could help enforce.

13         If there was no -- Mr. Stengel, on one known

14   occasion, acted inappropriately at a college campus.

15   If we were to be getting subsequent reports from the

16   college campus, that they were having ongoing issues,

17   we would be able to identify the possibility that it

18   might be Mr. Stengel, and to put a no -- an exclusion

19   zone on him for such movement.

20         THE COURT:  Okay.  Well, thank you Mr.

21   Albert.

22         Ms. George --

23         MR. DALE:  Can I, very briefly, Your Honor?

24   I'm sorry, just because a record has been made, and I

25   -- and there's certainly one portion I do want to

1   address, and that's the wine bottles.

2           Mr. Stengel and his wife have a wine cellar.

3   They collect wine.  He does not drink heavily at all.

4   He would never drink unless it's with a meal, have a

5   couple of glasses of wine a week.

6           Empty wine bottles are ones that, after

7   they've drank the wine, because it's wine they collect,

8   they keep the bottles.  I don't find that odd at all.

9   In fact, I do it.  I've got a wine cellar.  It's my one

10  kind of vice.  I love wine.  I'd love to collect wine.

11          THE COURT:  And you just leave the empty

12  bottles around your house, or in (unintelligible)?

13          MR. DALE:  Well, they're not -- and I think

14  if anyone were to go to the Stengels, they wouldn't

15  find them just thrown around the house.  There are

16  empty bottles, but they're stacked up there in an

17  order.

18          There's just -- And in two years of

19  supervised release, there's never been a hint that he's

20  abused alcohol.  There's never been an indication that

21  he's been drunk, that he's been intoxicated at all, and

22  to tell someone they can't simply have a couple glasses

23  of wine a week with a meal --

24          THE COURT:  Mr. Albert is suggesting that use

25  of alcohol, in conjunction with certain medications

1    that Mr. Stempel is taking, is sort of mutually

2    exclusive, as opposed to mutually inclusive.

3          I don't know.  I mean, I'm not a doctor, and I

4    don't know the implications of mixing alcohol with

5    whatever medications he's taking, so I understand your

6    point, and I'm just doing the report and

7    recommendation, and mainly a report for Judge Kolar-

8    Kotelly.  She ultimately will make a decision with

9    respect to the request of the probation office, and I

10   will try to do justice to both sides' --

11         MR. DALE:  Thank you, Your Honor.

12         THE COURT:  -- positions, and I haven't heard

13   from the government yet.

14         Thank you, Mr. Dale.

15         MS. GEORGE:  Your Honor, with respect to the

16   request for the no alcohol prohibition, the government

17   will defer to the Court and Judge Kollar-Kotelly to

18   assess whether that's necessary or not.

19         With regard to the polygraph testing, the

20   defendant has already conceded that he's going to

21   comply with that.

22         With regard to the GPS monitoring, the

23   government would like to specifically address the main

24   issue here, which is the risk to the public, which has

25   been documented by the defendant's conviction, and the

1    Court has heard, in previous preliminary --

2          THE COURT:  The conviction was for what?

3          MS. GEORGE:  Child pornography.

4          THE COURT:  Child pornography.

5          How would a GPS --

6          MS. GEORGE:  The conditions that --

7          THE COURT:  -- secure -- I mean, I guess if

8    you traced him to a store that openly sold child

9    pornography --

10          MS. GEORGE:  Or one that uses a computer,

11    where he can access child pornography.

12          THE COURT:  So, in other words --

13          MS. GEORGE:  He has specific conditions --

14          THE COURT:  -- the GPS would identify whether

15    he's going on particular sites --

16          MS. GEORGE:  It would be able to tell his

17    location.  If he's at Starbucks where they have an

18    Internet Café, and he's there -- he was caught at --

19          THE COURT:  As opposed to having a computer

20    in his own home, or is that a condition of this

21    release?

22          MS. GEORGE:  Yes.  It says, "Not possess or

23    use computers" --

24          THE COURT:  Oh, I see.

25          MS. GEORGE:  -- "with on-line computer

1   services."

2          THE COURT:  I see.  No, I understand your

3   point.  Okay.  Yeah.

4          MS. GEORGE:  Right.

5          And so the government believes that the Court

6   has an interest to impose the condition that it

7   originally set, and more specifically, I think the

8   probation officer's concern is a real one.

9          The defendant, based upon his stresses and

10  his anxiety, was caught at George Washington Law School

11  using the Internet and then masturbating.  That type of

12  behavior, we certainly want to prevent, because there

13  are studies that indicate that the more photos of child

14  pornography that he views, will aid in his ability to

15  physically act out.  We don't know that he hasn't or

16  that he has, but we want to limit the opportunities

17  that he has to continue to view child pornography, and

18  the GPS monitoring is directly connected to that, to

19  the extent that probation can monitor if he's accessing

20  venues or places where there are computers.

21          And so the government -- I mean, Mr. Dale

22  may, I guess, for lack of a better characterization, a

23  very flippant response that he would be viewing

24  pictures in his home.  He's not viewing pictures in his

25  home.  I mean, lots of us have pictures in our home.

1    We don't have pictures of --

2              THE COURT:  These are photographs, I think.

3              MS. GEORGE:  Or photographs, or whatever they

4    are, but the ones we have in our homes are not of child

5    pornography, and so, I mean, he shouldn't be looking at

6    any of those types of photographs, in his home or

7    anywhere.

8              THE COURT:  Right.

9              MS. GEORGE:  So, the government would argue

10   that the GPS monitoring is not an unreasonable

11   condition.  It is certainly related to his conviction,

12   and it is certainly related to the condition that the

13   Court originally set, to prevent this future activity.

14             THE COURT:  Thank you, Ms. George.

15             Mr. Dale, you want to briefly respond to --

16             MR. DALE:  Yes, Your Honor.

17             THE COURT:  -- the government's position?

18             It seems to me that if there's a condition,

19   and I, you know, I'm just coming to this memorandum, so

20   I haven't read it, but --

21             MR. DALE:  There is a condition --

22             THE COURT:  -- I see here where Judge Kollar-

23   Kotelly said, "Not possess or use computers with on-

24   line computer services."

25             How else is the probation office going to

1    monitor whether or not Mr. Stengel is in compliance,

2    since you can access computer services literally in

3    stores down, you know --

4            MR. DALE:  I think your question begs the

5    answer, Your Honor, and that is a GPS is not going to

6    tell you whether or not Mr. Stengel is on a computer.

7    That is a condition of his release, that he not -- but

8    his wife has a computer at home.  It's password

9    protected.  Probation office knows it, but if he wanted

10   to, and if she wanted to help him, and she's in court

11   today, she can simply go in and type in her password

12   and he's got it right there.

13           In today's society, unfortunately, he could go

14   anywhere, including in this courthouse, and access a

15   computer and go on line and, if he wanted to, look at

16   child pornography, and there is nothing that anyone --

17   that a GPS is going to do to tell the probation officer

18   that while he came down to drop off his monthly report

19   on the fifth of a month, he didn't access a computer

20   here.

21           That's the absurdity of it, Your Honor, is

22   that it's not going to help do anything, other than

23   it's gonna require him to pay for it, and they've asked

24   that he pay for this monitoring.

25           It's going to require him to -- Maybe it's a

1    minor inconvenience, but he's still got to wear this on

2    his ankle.  He can't take a bath.  He can take a

3    shower.  It is such a limiting effect for something

4    that is not going to help at all.

5            THE COURT:  Well, it's a -- it has an

6    inhibiting aspect to it.  I understand the point you're

7    making about it.

8            MR. DALE:  There comes a point --

9            THE COURT:  You know, it's a little bit like

10   the, you know, if you don't see the tree in the forest

11   falling, it doesn't make any noise.  People can, if

12   there's no police officers around, go through red

13   lights or go through stop signs and, on the other hand,

14   if you are not sure whether or not there is some law

15   enforcement individuals, you tend to comply with that

16   requirement.

17           It seems to me that if a location that is

18   being used by Mr. -- that if they find that he is

19   frequenting a particular type of location where there

20   would be access to the computer, that is something that

21   would perhaps raise a red flag, as far as the probation

22   office is concerned.

23           You know, the point is well taken, in terms

24   of his wife, who could give him the password.  Should

25   she do that, of course, she would be jeopardizing his

1    liberty at that point, --

2              MR. DALE:  That's right.

3              THE COURT:  -- because I think she is under a

4    directive not to provide that password, but she wants

5    to violate that, fine, then she may be subjecting

6    herself to contempt of court, or any other sanction

7    that a Court could impose.

8              So, all right.  Well, I -- again, I -- your

9    point will be -- will find its way to Judge Kollar-

10   Kotelly, in terms of having her make the ultimate

11   determination as to whether or not GPS would be an

12   appropriate additional condition, based upon the

13   conditions that she imposed, and as you've indicated, I

14   think wisely, your client would comply with any

15   conditions as -- that are set by the trial court, and

16   your position with respect to the, perhaps, need for,

17   or usefulness of such conditions, will be determined by

18   the trial judge.

19             Thank you.

20             MR. DALE:  Thank you, Your Honor.

21             THE COURT:  And in compliance with the

22   request of the probation office, I will publicly, on

23   the record, commend to Mr. Stengel, that he, in fact,

24   comply with the condition that he present himself for a

25   polygraph test, if that is requested by any of his

1    treating therapists.

2             Thank you, Counsel.

3             Nothing further.

4             MR. DALE:  Thank you, Your Honor.

5             May I be excused, Your Honor?

6             THE COURT:  You may indeed.

7             Mr. Albert, I can keep this memorandum, or

8    you need to make a copy --

9             THE PROBATION OFFICER:  Yes, you may.

10            THE COURT:  All right.

11        (Proceedings concluded at 11:21 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          November 15, 2008

STEPHEN C. BOWLES